RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0018p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MICHAEL J. BIESTEK,

*Plaintiff-Appellant*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

*Defendant-Appellee*.

No. 17-1459

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:16-cv-10422—Linda V. Parker, District Judge.

Argued:  October 6, 2017

Decided and Filed:  December 27, 2017[*]

Before:  CLAY, COOK, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Meredith E. Marcus, DALEY DISABILITY LAW, P.C., Chicago, Illinois, for Appellant.  Michael L. Henry, SOCIAL SECURITY ADMINISTRATION, Boston, Massachusetts, for Appellee.  **ON BRIEF:**  Meredith E. Marcus, Frederick J. Daley, Jr., DALEY DISABILITY LAW, P.C., Chicago, Illinois, for Appellant.  Michael L. Henry, SOCIAL SECURITY ADMINISTRATION, Boston, Massachusetts, for Appellee.

---

[*]This decision was originally filed as an unpublished opinion on December 27, 2017.  The court has now designated the opinion for publication.

_____

**OPINION**

_____

COOK, Circuit Judge.  Plaintiff-Appellant Michael J. Biestek ("Biestek") alleges that he became disabled on October 28, 2009, for purposes of receiving Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.  An Administrative Law Judge ("ALJ") issued a partially favorable decision finding Biestek disabled beginning May 4, 2013, some three-and-a-half years short of the time he claimed.

Biestek sought judicial review of the ALJ's finding of non-disability for the period between October 28, 2009, and May 4, 2013.  The district court rejected his claims.  We AFFIRM.

## I.  BACKGROUND

Biestek, fifty-four, worked for most of his life as a carpenter and a laborer in various construction-related roles.  His work frequently entailed transporting scaffolding, panels, and other construction materials around work sites.  He completed at least twelve years of education, plus one year of college, and received additional vocational training as a bricklayer and carpenter.  He stopped working in June 2005, allegedly due to degenerative disc disease, Hepatitis C, and depression.

Biestek applied for Supplemental Security Income and Disability Insurance Benefits in March 2010, alleging a disability onset date of October 28, 2009.  The Social Security Administration ("SSA") initially denied this application in August 2010.  Biestek requested a hearing before an ALJ, the ALJ denied Biestek's application, and the Social Security Administration Appeals Council denied review.  Biestek timely appealed to the district court.  That court adopted a magistrate judge's report and recommendation and remanded the case to the SSA because the ALJ had not obtained necessary medical-expert testimony and did not pose a sufficiently specific hypothetical to the vocational expert.

Following a second hearing and additional opinion gathering, the ALJ issued a partially favorable decision finding Biestek disabled starting on his fiftieth birthday (May 4, 2013)—the point at which the Agency deems an applicant "closely approaching advanced age" and thus presumptively disabled pursuant to 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.14; *see also* 20 C.F.R. § 404.1563(d) (defining persons "closely approaching advanced age" as between ages fifty and fifty-four). The ALJ found that Biestek was "not disabled" before May 4, 2013, however.

Biestek again appealed to the district court. This time, though, the magistrate judge's report and recommendation found that the ALJ's decision should be affirmed in full. Rejecting Biestek's objections, the district court then adopted the report and recommendation. This timely appeal followed.

## II. ANALYSIS

Biestek briefs five issues, but because he forfeited one by failing to timely raise it before the district court, just four are properly before us.[1] We will affirm the SSA's conclusions unless the ALJ applied incorrect legal standards or her findings were not supported by substantial evidence in the record. *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010). Substantial evidence supports a decision if "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" backs it up. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Thus, a decision supported by substantial evidence must stand, even if we might decide the question differently based on the same evidence. *Wright-Hines*, 597 F.3d at 395. It is not our role to "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

---

[1]Biestek also argues that the ALJ erred by not accounting for alleged moderate limitations in his concentration, persistence, or pace. But because Biestek failed to address this issue in his objections to the magistrate judge's report and recommendation, we consider it forfeited on appeal. *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991).

**A.     Substantial Evidence Supports the ALJ's Finding that Biestek's Medical Condition Did Not "Medically Equal" the Listing**

Biestek contends the ALJ incorrectly found that he did not meet or medically equal the back-pain-related impairment listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A1, § 1.04(A).[2] The impairment must last for at least twelve months to meet the terms of the listing. *Id.* at § 1.00(B)(2)(a).   The ALJ determined Biestek did not meet or medically equal the listed impairment because Biestek "lack[ed] the requisite motor and sensory deficits, and there [was] no evidence of spinal arachnoiditis or spinal stenosis resulting in pseudoclaudication."  The ALJ relied significantly on agency-appointed expert Dr. Frank L. Barnes's opinion that Biestek's physical condition neither met nor equaled a medical listing while assigning minimal weight to the opinions of Biestek's retained expert, Dr. Alexander J. Ghanayem.

Biestek claims that he "medically equaled" the listing because he displayed all the required criteria at one point or another during the relevant period, even if not concurrently or consistently over twelve months.  He also argues that Dr. Ghanayem offered analysis and explanations superior to the allegedly flawed testimony of Dr. Barnes, so that reliance on Barnes's testimony cannot constitute "substantial evidence" in support of the ALJ's opinion.

*1. The ALJ Reasonably Found Biestek Did Not "Medically Equal" the Listing*

Biestek argues that "medically equaling" the listing does not require all symptoms to be present consistently for a twelve-month period, and that to impose such a requirement would erase the distinction between "meeting" and "medically equaling" a listing.  He maintains that displaying different deficits at different times over the course of twelve months is enough to satisfy the duration requirement.

As the Commissioner points out, however, medical equivalency is not a refuge for claimants who show only intermittent signs of impairment.  The Commissioner's own regulation makes clear that equivalency exists where a claimant's impairment "is at least equal in severity

---

[2]This listing, for "disorders of the spine," requires (in relevant part) "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A1, § 1.04(A).

*and duration* to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a) (emphasis added); *see also Kidd v. Colvin*, No. CV 115-207, 2017 WL 914061, at *4 (S.D. Ga. Feb. 2, 2017) (magistrate's report and recommendation) (finding a failure to meet the duration requirement where the claimant's back pain was only demonstrated by "a handful of abnormal findings scattered throughout the record"), *adopted in full sub nom. Kidd v. Berryhill*, No. CV 115-207, 2017 WL 901896, at *1 (S.D. Ga. Mar. 7, 2017). Medical equivalency does not relieve claimants of the need to demonstrate the long-term nature of an impairment. The Commissioner's regulation allows for variation in the number, type, or severity of the claimant's conditions, so long as the claimant's overall impairment is "at least of equal medical significance" to a listed impairment. 20 C.F.R. § 404.1526(b)(ii). The regulations make no provision, however, for claimants whose condition is reasonably found to be sporadic or intermittent.

## 2. *The ALJ Reasonably Relied on Dr. Barnes's Testimony*

Dr. Barnes noted the absence of positive straight leg-raising[3] on most examinations, and that numbness, reflex change, and atrophy were not consistently present over a twelve-month period. In Barnes's opinion, Biestek did not meet or equal any listing. Furthermore, the ALJ noted that MRI images in the record show "only mild-to-moderate degenerative changes with no more than mild stenosis."

Biestek's expert, Dr. Ghanayem, assessed the evidence differently, concluding that Biestek more than met or medically equaled the terms of the listing. The ALJ gave "little weight" to Dr. Ghanayem's opinion, however, due to inconsistencies between Dr. Ghanayem's assessments and other objective medical evidence in the record. Dr. Ghanayem's opinion of Biestek's condition is in tension with the findings of multiple radiologists interpreting multiple MRIs over several years.

---

[3]A straight-leg raising test (also called a Lasegue test) evaluates a patient's lower back pain. The patient lies on his back and his care provider raises his leg upward, keeping the knee straight. If the patient experiences pain, the test is positive (an abnormal result). *See* 2 Dan J. Tennenhouse, Attorneys Medical Deskbook § 18:4 (4th ed. 2017).

Additionally, we note other evidence showing Biestek had, at best, inconsistent back issues during the period he was under the care of treating physician Dr. Howard Wright. Some appointment notes do not reference back pain, only reporting Biestek as having "normal gait and station," while others only a short time later mention some pain.

Dr. Ghanayem also attempted to explain the inconsistent straight-leg raising test results. According to Dr. Ghanayem, if the underlying nerve condition becomes chronic and persists for a significant period, the affected nerves can become so damaged and desensitized that a person can pass the test. Dr. Barnes presented an alternative explanation: in some cases, a patient's spinal injuries heal by themselves, resulting in increased mobility sufficient to pass the straight-leg raising test.

Biestek argues that the ALJ inappropriately credited Dr. Barnes's testimony over Dr. Ghanayem's opinions. But just because Dr. Ghanayem offered explanations that could reconcile elements of the objective medical record with Biestek's claims does not mean that the ALJ was required to accept those explanations. The ALJ faced dueling opinions from two highly qualified medical experts and found Dr. Barnes's testimony more credible after assessing how well his testimony fit with the objective medical record—a determination she was fully empowered to make. *See Crum v. Sullivan*, 921 F.2d 642, 644 (2d Cir. 1990) ("The [Commissioner], and not the court, is charged with the duty to weigh the evidence, to resolve material conflicts in the testimony, and to determine the case accordingly."). The ALJ based her decision on substantial evidence.

**B.     The ALJ Acceptably Evaluated Medical Opinion Evidence**

Next, Biestek contends that the ALJ failed to properly weigh opinion evidence from two medical experts, Drs. Wright and Barnes.

*1. Dr. Wright's Opinions*

Dr. Wright saw Biestek frequently between October 2012 and April 2013, and filled out a residual functional capacity ("RFC") questionnaire detailing Biestek's condition in July 2015.

Biestek argues that the ALJ erred in not according controlling weight to any of Dr. Wright's assessments.

An ALJ is required to give controlling weight to a treating physician's opinion, so long as that opinion is supported by clinical and laboratory diagnostic evidence not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). But if the ALJ concludes that a treating source's medical opinion is not entitled to controlling weight, she must weigh the opinion in light of several factors. *See* 20 C.F.R. § 404.1527(c) (listing factors). The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide "good reasons" for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion. *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804–05 (6th Cir. 2011); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406–07 (6th Cir. 2009); 20 C.F.R. § 404.1527(c)(2).

Dr. Wright provided three opinions on Biestek's condition. Two are reports to the Michigan Department of Human Services from April and October 2013. The third is a residual functional capacity questionnaire created for Biestek's present disability application, from July 2015.

The ALJ declined to give any of Dr. Wright's opinions controlling weight and instead assigned them minimal weight. The ALJ discounted the July 2015 opinion entirely, noting that by then Dr. Wright had not seen Biestek for over two years. Additionally, the ALJ stated that Dr. Wright's earlier opinions were not supported by the objective medical record evidence. She pointed to the "numerous MRI studies [which] showed no more than mild-to-moderate degenerative findings" as the "most notabl[e]" example, but did not specifically refer to any additional evidence in the record to support her reasoning.

Biestek claims the ALJ gave Dr. Wright's opinions short shrift. At a minimum, he asserts the ALJ should have afforded Dr. Wright's 2013 opinions the substantial weight generally accorded a treating physician's opinions. The magistrate judge's report and recommendation agrees that Dr. Wright was one of Biestek's treating physicians during this

period.  Biestek states that MRI evidence was "the *only* reason offered by the ALJ to reject Dr. Wright's assessment," and that the ALJ ignored substantial evidence in the record demonstrating Biestek's efforts to alleviate significant pain.  Additionally, Biestek argues that the ALJ's reliance on the MRI findings is misplaced in light of Dr. Ghanayem's alternative explanation of the MRI imaging as consistent with Biestek's alleged impairments.

The ALJ had adequate reason to assign minimal weight to Dr. Wright's July 2015 questionnaire.  By that time, Dr. Wright had not provided Biestek with medical care for over two years, clearly indicating that Dr. Wright and Biestek were no longer in a treatment relationship. *See* 20 C.F.R. § 404.1527(c)(2)(i)–(ii).

As for Dr. Wright's earlier opinions, while they may be somewhat in accord with other evidence, they are nonetheless inconsistent with prior MRI results showing only mild-to-moderate degeneration.  Biestek alleges that the ALJ's failure to elaborate on her specific rationale for discounting Dr. Wright's 2013 opinions beyond referencing the MRI evidence amounts to a failure to provide "good reasons," warranting reversal.  But the MRIs were only the "most notabl[e]" evidence the ALJ relied on; other evidence in the record also supports the ALJ's decision.  We may consider this evidence, even if the ALJ failed to mention it. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) ("Judicial review of the Secretary's findings must be based on the record as a whole.  Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited [in prior SSA proceedings].").**[4]**

Here, the ALJ provided a rationale and referred to particular evidence in the record.  The point of the "good reasons" rule is to permit meaningful review of the ALJ's decision and to ensure that a claimant is not "bewildered" when an administrative bureaucracy tells him that he is not disabled. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.

---

**[4]**Other Sixth Circuit cases finding that an ALJ failed to provide "good reasons" where the ALJ did not cite material in the record that could have supported the ALJ's decision are distinguishable.  In *Wilson*, the ALJ offered only a summary rejection of the opinion of the claimant's treating physician, with no analysis or support whatsoever. 378 F.3d at 545–46.  And in *Rogers v. Commissioner of Social Security*, the ALJ dismissed the reports of multiple treating physicians based on evidence that could not reasonably outweigh the evidence proffered by the treating physicians.  486 F.3d 234, 243–44 (6th Cir. 2007).

1999)).  There are no such problems in this case.  In addition to the MRIs, other record evidence supports the ALJ's conclusion, even if she referenced such evidence in a more general way.

As the Commissioner points out, the examination notes from Biestek's various visits to Dr. Wright during the six-month period when Dr. Wright was Biestek's treating physician provide some of the most notable evidence apart from the MRIs.  There is little consistency regarding the back pain alleged.  The first report describes Biestek as possessing "normal gait and station," and makes no mention of any back pain issues.  The next two exams identified back pain as an issue, but no back pain is reported in the following three exams.  Back pain then re-emerges on the final set of examination notes.  These exam notes are difficult to reconcile with the stark portrait of Biestek's condition that Dr. Wright painted in the two 2013 medical examination reports.

Substantial evidence supported the ALJ's decision, and the ALJ provided a sufficient rationale.  "No purpose would be served by remanding for the ALJ to explicitly address the shortcomings of [Dr. Wright's] opinion and the evidence and methods underlying it." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006).

*2. Dr. Barnes's Opinion*

a. Restriction on Bending at the Waist and Lifting Weight

Dr. Barnes testified that Biestek could occasionally squat and pick up objects weighing up to ten pounds, but that he would not be able to bend at the waist to do so.  The ALJ gave this portion of Dr. Barnes's testimony "great weight," but did not incorporate a specific restriction on bending at the waist to lift up to ten pounds into her RFC analysis or into a hypothetical posed to the vocational expert.  Biestek contends that, as a result, the hypothetical "did *not* fairly portray Biestek's limitations as supported by the objective evidence and the ultimate findings by the ALJ," an error that "cannot be deemed harmless" because the ALJ specifically granted this portion of Barnes's testimony great weight.

The ALJ actually did incorporate a restriction on "occasional stooping," however.  The Agency defines "stooping" as "bending the body downward and forward by bending the spine at

the waist." SSR 83-14, 1983 WL 31254, at *2 (Jan. 1, 1983). Biestek replies that the ALJ's reference to "occasional stooping" conflicts with Dr. Barnes's total prohibition on bending at the waist. But Biestek is mistaken: Dr. Barnes did not impose a restriction on *all* bending at the waist. He only opined that Biestek could not bend at the waist *and lift weight*. The ALJ not only incorporated a limit on weight lifting into her hypothetical, she was even more restrictive than Dr. Barnes. The ALJ asked the vocational expert if jobs would be available for someone who "could not lift more than five pounds at a time." Overall, the ALJ adequately addressed the ultimate issue—Biestek's ability to lift up to ten pounds of weight.

Biestek also claims that because the SSA has itself held that some stooping is required to do most work, the ALJ should have sought further clarification on the impact of stooping. The vocational expert proposed two jobs—bench (final) assembler and nut sorter—from the *Dictionary of Occupational Titles* ("DOT") that the ALJ incorporated into her RFC analysis. But neither of these jobs requires any stooping at all. DOT § 713.687-018, 1991 WL 679271 ("Stooping: Not Present – Activity or condition does not exist."); *see also* DOT § 521.687-086, 1991 WL 674226 (same).

### b. Exertion of Force

Biestek also complains that according to the DOT, the bench assembler and nut sorter jobs may have required Biestek to "exert[] up to 10 pounds of force occasionally[5] . . . and/or a negligible amount of force frequently[6] to lift, carry, push, pull, or otherwise move objects," in violation of Dr. Barnes's prohibition on lifting ten pounds from the waist. DOT § 713.687-018, 1991 WL 679271 (final assembler); DOT § 521.687-086, 1991 WL 674226 (nut sorter). Yet nothing in the DOT indicates that such exertion requires lifting objects from ground level. As the Commissioner points out, Biestek could have exerted the necessary force in other ways, such as while seated or while working with objects at table height.

---

[5] The DOT defines "occasionally" as an "activity or condition exist[ing] up to 1/3 of the time." DOT § 713.687-018, 1991 WL 679271; *see also* DOT § 521.687-086, 1991 WL 674226 (same).

[6] "Frequently" is defined as an "activity or condition exist[ing] from 1/3 to 2/3 of the time." DOT § 713.687-018, 1991 WL 679271; *see also* DOT § 521.687-086, 1991 WL 674226 (same).

**C.      The ALJ Acceptably Assessed Biestek's Credibility**

The ALJ described the various treatments Biestek has received over the years as "relatively effective in controlling his symptoms." The efficacy of these treatments diminished Biestek's credibility. The ALJ also noted that, throughout the record, Biestek reported engaging in a variety of daily activities suggestive of physical capacity to perform at least some sedentary work. Further, the ALJ discussed Biestek's history of non-compliance with his treatment regimen, citing numerous examples of Biestek cancelling or no-showing his medical appointments and his failure to take many of his medications as prescribed. These findings factored into the ALJ's RFC assessment.

Biestek takes issue with each of these alleged faults in his credibility, and additionally charges that the opinions of Drs. Barnes and Ghanayem should have enhanced his credibility. His task is especially difficult: while an ALJ's credibility determinations must be supported by substantial evidence, we accord them special deference. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Given this standard, we cannot say the ALJ erred.

*1. Symptom Control*

The ALJ cited Biestek's favorable reaction to Demerol, as well as nerve blocks, physical therapy, and back injections as examples of treatments that provided Biestek relief. Biestek alleges that the ALJ wrongly characterized these treatments as permanently "controlling" his pain rather than granting temporary respite. There is certainly record evidence showing that these measures did not completely negate Biestek's pain, and that in some cases treatment benefits did not persist for an extended period. But the ALJ never characterized Biestek's pain as permanently and comprehensively mitigated, instead describing the various treatments Biestek received as "relative[ly] effective[]." Moreover, she acknowledged the pain Biestek continued to endure by restricting his RFC to a narrow range of sedentary work with a variety of accommodations.

## 2. *Daily Activities Considered*

The ALJ noted that, at various times, Biestek said he engaged in a range of activities indicative of his RFC. For example, Biestek reported reading the newspaper, preparing simple meals, visiting his son at least twice a week, driving, doing laundry, shopping, cashing checks, providing childcare, watching television, running errands, playing video games, and making appointments.

Biestek objects to the ALJ's characterization of these activities, noting that he could do several of them from any position, including reading the newspaper, making appointments, and watching TV. He disputes the ALJ's assertion that he participated in childcare as Biestek's son was seventeen years old at the time of the 2015 hearing, making it unclear what "childcare" he could be engaged in. He also attempts to add color to several of the other tasks. He describes driving a car as a rare event, perhaps only occurring once a month. He says he confines his meal preparation to the microwave, does the laundry just once every two to three weeks, and only goes to the grocery store approximately once a month (and that even at the store, he has had to lie down in the aisle to relieve bouts of pain).

While Biestek's ability to perform many of these activities is definitely limited, the ALJ also cited other activities much more obviously at odds with his claims of debilitating pain. For example, once Biestek started taking Vicodin, his quality of life improved such that he was able to exercise and play football with his son. Overall, the ALJ based her conclusions on a reasonable interpretation of the record.

## 3. *Non-Compliance with Treatment Regimen*

The ALJ also noted that Biestek has been non-compliant with his prescribed treatments, undercutting his testimony concerning the severity of his condition. In particular, the ALJ pointed to Biestek's repeated no-shows and cancellations for his medical appointments. Additionally, the ALJ referred to Biestek's admitted habit of selectively taking his prescribed medication. He took his pain medication "once in a while as needed." Other medications reveal even more problematic usage patterns. His care provider noted that Biestek stopped taking Wellbutrin (an antidepressant) both because it made him feel "weird," and because "he does not

believe much in medication so that is why he does not take it." The care provider also noted that Biestek "reports he does not tell Gianina Cristiu, NP about not taking medication because he does not want to hurt his chances of obtaining SSI." While adverse side effects are a reasonable excuse for an applicant to interrupt a prescribed treatment regimen, *see* SSR 16-3P, 2016 WL 1119029, at *9 (Mar. 16, 2016), the other rationales Biestek supplied for not taking certain medications display a pattern of behavior the ALJ reasonably interpreted as undermining Biestek's credibility.

### 4. *Testimony of Drs. Barnes and Ghanayem*

Biestek further contends that because Drs. Barnes and Ghanayem concurred that Biestek's subjective statements were "entirely consistent with his pathology," the ALJ erred in failing to address this favorable credibility evidence. But the ALJ had significant reasons for discounting Dr. Ghanayem's testimony, and Dr. Barnes testified that Biestek could tolerate a range of sedentary work. The ALJ's failure to respond to these opinions does not deprive her decision of the support of substantial evidence.

### 5. *The ALJ's Use of Evidence from After Biestek's Disability Date*

Some of the evidence discussed by the ALJ postdates May 4, 2013, when the ALJ found Biestek disabled upon his fiftieth birthday. For example, the ALJ referenced a July 23, 2013, report by Edward Czarnecki, Ph.D., indicating that Biestek "could perform simple, rote, repetitive unskilled work." Citing no authority, Biestek claims that it was unfair to point to evidence after Biestek's disability date to impugn his credibility before that time. This is a flawed argument. Nothing about Biestek's substantive medical condition changed on May 4, 2013; he simply turned fifty years old, thereby creating an administrative presumption that he was disabled. 20 C.F.R. Part 404, Subpt. P, App. 2, § 201.00(g). Evidence from after his formal disability date is as relevant to discerning Biestek's credibility as evidence predating it.

**D.    The ALJ Did Not Err in Refusing to Require the Vocational Expert to Provide Specific Data in Support of Her Opinions**

Finally, Biestek argues that the ALJ erred by refusing to require the vocational expert to produce data or other documentation to support her opinions regarding the work available to

Biestek. Instead, the vocational expert based her testimony on the *Dictionary of Occupational Titles* and her "professional experience," gained from talking with employers and conducting job analyses. When Biestek's counsel requested the vocational expert produce underlying data or analyses in support of her statements, she refused, citing the confidentiality of her files, and the ALJ declined to require her to produce such information, even in a redacted format.

Biestek alleges reversible error because little substantiates the reliability of the vocational expert's testimony other than her word. Biestek argues such testimony falls short of "substantial evidence."

This court has not yet squarely addressed the extent to which vocational experts must produce underlying data in support of their opinions. There is a divide, however, between the Seventh Circuit and several other circuits that have staked a position. The Seventh Circuit adopted a rigorous approach in a pair of cases, *Donahue v. Barnhart*, 279 F.3d 441 (7th Cir. 2002), and *McKinnie v. Barnhart*, 368 F.3d 907 (7th Cir. 2004), incorporating the essence, if not the explicit requirements, of Federal Rule of Evidence 702 into the administrative adjudicative process as applied to vocational expert testimony. *See McKinnie*, 368 F.3d at 910–11. Expressing fear that vocational expert testimony could be "conjured out of whole cloth," *Donahue*, 279 F.3d at 446, the Seventh Circuit obliges vocational experts to provide the data and reasoning used in support of their conclusions upon request, *McKinnie*, 368 F.3d at 910–11. Biestek would like us to establish a similar rule for the Sixth Circuit.

But the Seventh Circuit's rule "has not been a popular export." *Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 449 (2d Cir. 2012). Congress specifically exempted Social Security disability proceedings from the strictures of the Federal Rules of Evidence, allowing ALJs to consider a broader range of potentially relevant information than would be admissible in an ordinary court of law. 42 U.S.C. § 405(b)(1) ("Evidence may be received at any hearing before the Commissioner of Social Security even though inadmissible under rules of evidence applicable to court procedure."). Yet despite Congress's explicit command, *Donahue* and *McKinnie* effectively import a key provision of the Federal Rules of Evidence into Social Security proceedings. As the Second Circuit noted, "[i]t is unclear . . . why the Seventh Circuit would acknowledge in *Donahue* that ALJs are not bound by the Rules of Evidence, but then turn

around and require ALJs to hew so closely to [them]." *Brault*, 683 F.3d at 449. Other courts of appeals have followed the Second Circuit's lead. *See Welsh v. Comm'r of Soc. Sec.*, 662 F. App'x 105, 109–10 (3d Cir. 2016) (rejecting the Seventh Circuit approach due to conflict with 42 U.S.C. § 405(b)(1)); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) ("An ALJ may take administrative notice of any reliable job information, including information provided by a [vocational expert]. A [vocational expert]'s recognized expertise provides the necessary foundation for his or her testimony. Thus, no additional foundation is required." (internal citation omitted)).

Furthermore, there is little clarity on how to apply the *Donahue* and *McKinnie* standards. The Seventh Circuit required the Commissioner to implement an evidentiary rule "similar though not necessarily identical to that of Rule 702," but it is unclear what, precisely, such a rule would look like. *Donahue*, 279 F.3d at 446.

While it is undoubtedly true that vocational expert testimony that is "conjured out of whole cloth" cannot be considered substantial evidence, *see id.*, the Commissioner rightly points out that "guarding against baseless testimony is very different" from incorporating the stringent evidentiary requirements embodied in the Federal Rules of Evidence. Moreover, Biestek aired his concerns to the ALJ, who accepted the vocational expert's testimony over his objections. There is "no reason to suppose that the ALJ did not carefully weigh the credibility of witnesses who testified, and the ALJ's acceptance of [the vocational expert's] testimony cannot be said to have been improper." *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 481 (6th Cir. 1988). Ultimately, responsibility for weighing the credibility of witnesses belongs to the ALJ, who in this case acceptably fulfilled that obligation.

### III. CONCLUSION

For these reasons, we AFFIRM the district court's decision.