RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0149p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BRADLEY A. CARDEW,

      *Plaintiff-Appellant*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

      *Defendant-Appellee*.

No. 17-2287

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:16-cv-11278—Mark A. Goldsmith, District Judge.

Argued: April 26, 2018

Decided and Filed: July 23, 2018

Before: BATCHELDER, McKEAGUE, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Stephen Sloan, DALEY DISABILITY LAW, P.C., Chicago, Illinois, for Appellant. Sean Santen, SOCIAL SECURITY ADMINISTRATION, Boston, Massachusetts, for Appellee. **ON BRIEF:** Stephen Sloan, Frederick J. Daley, Jr., DALEY DISABILITY LAW, P.C., Chicago, Illinois, for Appellant. Sean Santen, SOCIAL SECURITY ADMINISTRATION, Boston, Massachusetts, for Appellee.

_____

## OPINION

_____

McKEAGUE, Circuit Judge. Bradley Cardew—a wheelchair-bound individual with quadriplegia—landed a short-term, highly accommodated summer internship with Lear Corporation thanks to his cousin, a vice president at Lear. But as James Agate once quipped,

"Every good deed brings its own punishment." This aphorism surely resonated with Cardew, though with a twist: his cousin's good deed wrought unintended punishment on Cardew. After the internship, an administrative law judge (ALJ) denied Cardew's retroactive child disability benefits solely based on the income he received while at Lear. The ALJ reasoned (and the district court agreed) that because Cardew's earnings over three months exceeded a "bright line" threshold in the regulations, he had been "able to work at the substantial gainful activity level." But this legal framework is both incomplete and more rigid than the regulations require. Even assuming Cardew engaged in "gainful" activity, the ALJ failed to consider *all* the special conditions attendant to Cardew's internship that could rebut the presumption, created by his income, that he had engaged in "substantial" activity. And even assuming Cardew had exceeded the regulatory threshold after adjusting for his special conditions, the "line" does not burn so bright—adjusted income over the threshold only "ordinarily" shows that a claimant has engaged in substantial gainful activity. Accordingly, we **VACATE** in part the district court's judgment and **REMAND** for further proceedings consistent with this opinion.

**I**

At age fifteen, Bradley Cardew suffered a severe spinal injury from an accident that rendered him wheelchair-bound with C5–C6 quadriplegia. Cardew nevertheless attended Oakland University from 1999 until he graduated in 2009, though he has lived with his parents his entire life. In April 2012, Cardew sought assistance and filed an application for retroactive child disability benefits, alleging that he has been continuously disabled since November 30, 1999.[1] The Social Security Administration (SSA) denied his claim, finding Cardew ineligible because he had engaged in substantial gainful work after he turned 22-years old—solely based on a short-term, highly accommodated internship with Lear Corporation.

In the summer of 2004, Cardew's cousin, Jason—then a vice president at Lear Corporation—secured Cardew a position as a "finance department intern" in Lear's Rochester, Michigan, office. Cardew's supervisor was a family friend who had known Jason Cardew since childhood. For this internship, Cardew's job primarily consisted of completing tasks delegated

---

[1]Cardew retains $70,000 of an original $200,000 insurance settlement, and those assets, he claims, make him ineligible for Social Security Disability benefits.

to him by three or four full-time employees. These tasks included composing and updating spreadsheets regarding client billables, reviewing bills and invoices to determine any deficiencies, and various other forms of basic office work. Over approximately a three-month period, Cardew earned $5,502.75.

Lear made numerous accommodations to allow Cardew to perform his work comfortably despite his disability, including: a 30-hour work week, rather than the typical 40-hour week; exemptions from menial tasks typically assigned interns that involved traveling, such as picking up coffee or lunch, or attending meetings; exemptions from clerical tasks because of his difficulty with typing; and more frequent breaks to adjust his position in his wheelchair, in order to avoid skin ulcers and use the restroom. Lear also modified three doors to be wheelchair-accessible at a cost to Lear of $4,000. Lear's vice president of human resources determined that Cardew was approximately "35% less productive" than other summer interns, though his pay was not reduced for his lower productivity.

According to Cardew, "[t]he internship ended like it was supposed to" at the end of the term. Cardew noted that his cousin had informally offered to have him back the following year, but that opportunity never came to fruition because an economic downturn caused Lear to cut back the intern program. And, in fact, Cardew was again informally approached by his cousin in 2011 about returning to work for Lear in a full-time capacity, but that opportunity also fell through, mostly due to Cardew's physical limitations and the demands of full-time employment.

Cardew testified at length before the ALJ and submitted documentary evidence to support his claim for benefits. The issue before the ALJ was limited to whether any of Cardew's employment constituted "substantial gainful activity" under the applicable social security regulations, thereby precluding benefits. The ALJ ultimately denied Cardew's claim for benefits. She found that Cardew had engaged in "substantial gainful activity" during his three-month internship at Lear. Further, the ALJ held that Cardew had not established that his internship was an unsuccessful work attempt, or that employer subsidies or impairment-related work expenses reduced his earnings below the regulatory threshold. In particular, the ALJ held that "the costs incurred by Lear in adapting the workplace to suit the claimant's needs," i.e., the

installation of the handicap-accessible automatic doors, "are not impairment-related work expenses because they were not a cost paid by the claimant."

Cardew sought review from the SSA's Appeals Council. The Appeals Council denied his request, finding that there was no basis to overturn the ALJ's decision. Therefore, the ALJ's decision became the Commissioner's final decision in this case. *See* 20 C.F.R. § 404.981. Cardew then sued the Commissioner in the U.S. District Court for the Eastern District of Michigan. *See* 42 U.S.C. § 405(g). The case was assigned to a magistrate judge for a report and recommendation.

The magistrate judge first found that the Lear internship was substantial gainful activity under the pertinent regulation because it was the type of work that is typically done for pay or for profit; that the internship was not an unsuccessful work attempt since it did not end because of the removal of any special conditions; and that, after reducing Cardew's countable earnings by 35%, his income was still higher than the $810 minimum threshold for substantial gainful activity in 2004. Though describing the result as "harsh," the magistrate judge held that the ALJ correctly excluded the $4,000 cost incurred by Lear in installing handicap-accessible doors in his work area because substantial evidence supported the ALJ's conclusion that it was an impairment-related work expense borne by Lear, and not a subsidy deductible from Cardew's earnings. Therefore, the magistrate judge recommended that the district court affirm the ALJ's decision.

Cardew timely filed several objections to the magistrate judge's report. The district court overruled Cardew's objections adopted the magistrate judge's recommendation. Cardew now appeals.

**II**

We generally review the ALJ's decision under the deferential substantial-evidence standard. *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 782–83 (6th Cir. 2017). If the ALJ's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," the decision will generally stand. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). If such evidence exists, the court should defer "even if there is substantial evidence

in the record that would have supported an opposite conclusion." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). But we review legal questions de novo, including whether the ALJ applied the appropriate legal standard. *See id.* at 407; *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007). That is, "if the ALJ commits an error of law, the court must reverse and remand, 'even if the factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different.'" *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (quoting *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 859 (6th Cir. 2011)); *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545–46 (6th Cir. 2004).

## III

In this case, Cardew has applied for child disability benefits retroactive to age fifteen, when an accident rendered him with quadriplegia. Because he filed for benefits after his eighteenth birthday, he must prove that he has lived with a continuous disability since the accident. *See Zharn v. Comm'r of Soc. Sec.*, 35 F. App'x 225, 227 (6th Cir. 2002). Proof that Cardew has engaged in "substantial gainful activity" at any point during the relevant time period would demonstrate that his disability has not been continuous, at least for the purposes of retroactive child disability benefits. *See Futernick v. Richardson*, 484 F.2d 647, 648 (6th Cir. 1973). The regulations regarding "substantial gainful activity" span several sections. We first examine the section in its context and then explain why a limited remand is appropriate in this case.

## A

For purposes of retroactive child disability benefits, the Commissioner looks to whether the record reflects that a claimant has been "able to work at the substantial gainful activity level." 20 C.F.R. § 404.1571. "Substantial gainful activity is work activity that is both substantial and gainful." *Id.* § 404.1572. "Substantial work activity is work activity that involves doing significant physical or mental activities." *Id.* § 404.1572(a). "Gainful work activity is work activity that you do for pay or profit." *Id.* § 404.1572(b).

As a "general" matter, the Commissioner looks to five factors to determine whether a claimant has the ability to work at the substantial gainful activity level: (1) the nature of the claimant's work; (2) how well the claimant performs; (3) whether the claimant's work is done under special conditions; (4) whether the claimant is self-employed; and (5) time the claimant spent in work. *Id.* §§ 404.1573(a)–(e).

Relevant to this case, if the claimant "is unable, because of [his] impairments, to do ordinary or simple tasks satisfactorily without more supervision or assistance than is usually given other people doing similar work, this may show that [he is] not working at the substantial gainful activity level." *Id.* § 404.1573(b). Moreover, if the claimant's "work is done under special conditions, [the Commissioner] may find that it does not show that [the claimant] has the ability to do substantial gainful activity." *Id.* § 404.1573(c).[2] "Examples of the special conditions that may relate to [an] impairment include, but are not limited to, situations in which [the claimant]":

(1) "required and received special assistance from other employees in performing [his] work";

(2) "w[as] allowed to work irregular hours or take frequent rest periods";

(3) "w[as] provided with special equipment or w[as] assigned work especially suited to [his] impairment";

(4) "w[as] able to work only because of specially arranged circumstances, for example, other persons helped [him] prepare for or get to and from [his] work";

(5) "w[as] permitted to work at a lower standard of productivity or efficiency than other employees"; or

(6) "w[as] given the opportunity to work despite [his] impairment because of family relationship, past association with [his] employer, or [his] employer's concern for [his] welfare."

*Id.*

Separately, § 1574 provides "several guides" to determine whether the claimant is "able to do substantial gainful activity." An overarching consideration in determining whether a

---

[2]To be sure, this section also states that "work done under special conditions may show" that a claimant has "the necessary skills and ability to work at the substantial gainful activity level." *Id.*

claimant has engaged in substantial gainful activity is the amount of compensation he earned. The relevant regulation states: "Generally, in evaluating your work activity for substantial gainful activity purposes, our primary consideration will be the earnings you derive from the work activity. . . . Generally, if you worked for substantial earnings, we will find that you are able to do substantial gainful activity." *Id.* § 404.1574(a)(1). The regulations likewise set income thresholds that establish compensation floors. *See id.* § 404.1574(b).

Even so, we emphasize that "[t]he mere existence of earnings over the statutory minimum is not dispositive." *Keyes v. Sullivan*, 894 F.2d 1053, 1056 (9th Cir. 1990); *see, e.g.*, *Chicager v. Califano*, 574 F.2d 161, 164 (3d Cir. 1978) (finding that a claimant had rebutted the income presumption under a former version of the regulation). Instead, when a claimant earns income above the floor, a presumption arises that he or she has engaged in substantial gainful activity. *See Keyes*, 894 F.2d at 1056; *Chicager*, 574 F.2d at 164. "The claimant may rebut a presumption based on earnings with evidence of his inability . . . to perform the job well [or] without special assistance," *Keyes*, 894 F.2d at 1056, among other considerations and special conditions, *see* 20 C.F.R. § 404.1573(b)–(c); *see also id.* § 404.1574(a)(2).

A claimant may rebut the "presumption" based on gross earnings in two ways. First, the regulations provide a framework to subtract subsidized earnings and impairment-related work expenses from gross earnings. *See id.* §§ 404.1574, 1576. Adjusting for subsidized earnings based on special conditions attendant to the claimant's position is particularly appropriate where special conditions are easily quantified. "For example, when a person with a serious impairment does simple tasks under close and continuous supervision, our determination of whether that person has done substantial gainful activity will not be based only on the amount of the wages paid." *Id.* § 1574(a)(2). Rather, "[w]e will first determine whether the person received a subsidy; that is, we will determine whether the person was being paid more than the reasonable value of the actual services performed." *Id.* "We will then subtract the value of the subsidy from the person's gross earnings to determine the earnings we will use to determine if he or she has done substantial gainful activity." *Id.*

Still, the subsidy and work-related expense framework does not provide the sole rubric to evaluate disability claims. If that were so, then how could an ALJ, for example, consider

whether a claimant secured a paid position solely "because of family relationship"? *See id.* § 404.1573(c). This and other "examples of special conditions" seem difficult, if not impossible, to quantify in a subsidy analysis. Moreover, the special conditions in § 1573(c) are not factors but rather non-exclusive "examples" that can show the claimant does not have the ability to do substantial gainful activity. *Id.* At bottom, the regulations focus on a person's *ability* to engage in substantial employment. Income alone does not always capture a person's ability to engage in substantial activity, and the regulations give no indication that the factors in § 1573 only apply to the subsidy framework in § 1574(a).[3]

Second, therefore, the presumption may be rebutted in a rare case where a claimant's adjusted income does not demonstrate that he has the "ability to engage in substantial . . . activity," or "work activity that involves doing significant physical or mental activities." *Id.* § 404.1572(a); *see id.* § 404.1573(b); *id.* § 404.1574(b)(2) (delineating "[e]arnings that will *ordinarily* show that you have engaged in substantial gainful activity"). The presumption may be rebutted based on the claimant's performance, *id.* § 404.1573(b), or the special conditions attached to his work, *id.* § 404.1573(c), where the subsidy and impairment-related work expense framework does not adequately account for these factors. *See Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994) (citing 20 C.F.R. § 404.1573(b)–(c)) (reversing and awarding benefits because "[a]ny presumption that the work constituted substantial gainful activity created by the level of money [he] earned is destroyed" given his performance and "the special conditions under which he performed his work").

To be sure, it remains possible that even work done under special conditions may show that a claimant has "the necessary skills and ability to work at the substantial gainful activity level." 20 C.F.R. § 404.1573(c). Moreover, even earnings that "were not substantial will not necessarily show" that the claimant is "not able to do substantial gainful activity." *Id.*

---

[3]Because only § 1574(c) expressly references the special conditions in § 1573(c), one could argue that the "special conditions" are relevant to analyze solely whether one has had "an unsuccessful work attempt." But that is unpersuasive for two reasons. First, although the *removal* of special conditions can evidence an "unsuccessful work attempt," *id.* § 1574(c)(2), the *existence* of special conditions can show an inability "to do substantial gainful activity," *see id.* § 1573(c), in the first place. Second, the subsidy framework in § 1574(a) contemplates adjustments for certain special conditions and an example there dovetails with at least one special-condition example in § 1573(c). However, as we will explain, this does not mean that an ALJ should *only* use the subsidy framework to account for special conditions in every case, let alone only one or a few special conditions.

§ 404.1574(a). Whether the claimant's work history demonstrates his ability to engage in substantial gainful activity requires a holistic analysis of a variety of factors, *see id.* § 404.1573, guided but not dictated solely by income in all cases, *see id.* § 404.1574, and tailored to the medical and vocational evidence in an individual claimant's case, *see id.* § 404.1571.

**B**

We are convinced that a limited remand is appropriate for further consideration under both rebuttal avenues given the unique circumstances in this case.

First, the ALJ failed to consider *all* examples of special conditions implicated in Cardew's case in assessing whether Cardew could rebut the presumption his income created in the subsidy framework. A deeper dive into the ALJ's decision illustrates how this came to pass. Prior to Cardew's hearing before the ALJ, Lear received a "work activity questionnaire" that was designed to obtain "information about subsidy." The questionnaire posed six questions:

1. Does the employee complete all the usual duties required for his/her position?

2. Is the employee able to complete all of the job duties without special assistance?

3. Does the employee regularly report for work as scheduled?

4. On average, does the employee complete his/her work in the same amount of time as employees in similar positions?

5. Please indicate the type(s) of special assistance, if any, the employee receives on the job that is not regularly given to other employees.

6. Based on the information above, approximately how would you rate the productivity of the employee compared to other employees in similar positions and similar pay rates?

Responding to the final question, Lear's representative estimated that five factors "combined"— "reduced work hours, arrangement of work locations closer to the claimant's home, inability to travel to meetings, inability to do certain clerical functions, and need for frequent breaks"— "placed Mr. Cardew at approximately 35% less productive than other Summer interns."

We note that these questions do not directly mirror the "examples of special conditions" listed in § 1573(c), all of which exist in Cardew's case. And the overarching question only

directly relates to one of the six "examples of special conditions" listed in § 1573(c)—"You were permitted to work at a lower standard of productivity or efficiency than other employees," *id.* § 404.1573(c)(5)—though it arguably incorporates three others, *id.* §§ 404.1573(c)(1)–(3). Even so, and solely based on this questionnaire,[4] the ALJ determined that Cardew "received a [35%] subsidy," *see id.* § 404.1574(a)(2), "subtract[ed] the value of the subsidy from [his] gross earnings to determine [adjusted] earnings," *see id.*, and concluded that Cardew's earnings exceeded the threshold, *see id.* § 404.1574(b)(1).

Notably, however, neither Lear nor the ALJ considered (a) whether Cardew "was provided with special equipment," (b) whether "other persons helped [Cardew] prepare for or get to and from [his] work," and (c) whether Cardew "w[as] given the opportunity to work despite [his] impairment because of family relationship." *See id.* In addition, Lear submitted a *separate* questionnaire, one that the ALJ apparently never considered. The very first question asked: "Was Bradley Cardew granted the opportunity to work, despite his handicap, because of a family relationship, past association with the company, or other altruistic reasons?" The Vice President of Human Resources at Lear responded: "Yes, Mr. Cardew was referred by a key Lear employee." Indeed, this questionnaire reflected that Cardew satisfied *every* "example of a special condition" under § 1573(c). Yet, the ALJ did not reference this questionnaire, nor in particular the fact that Cardew received the job because of his family relationship.[5]

While substantial evidence could arguably otherwise support the ALJ's calculation, the ALJ failed to analyze all the "special conditions" listed in § 1573(c) before or after engaging in a subsidy analysis under § 1574. She purported to account for certain "special conditions" in her quantitative subsidy analysis—arriving at a 65% productivity estimate—but not, as the

---

[4]An employer under these circumstances could be hesitant to candidly discount a disabled intern's capacity or abilities, particularly where a well-placed family member works at the company. One can imagine an HR representative being reluctant to assert, for example, that Cardew was only half as productive (or even less so) as his peers. Thus, we question whether an ALJ should merely adopt wholesale an employer's estimation without performing an independent assessment.

[5]Another noteworthy statement contained in that separate questionnaire noted: "The position Mr. Cardew held was designed *specifically for him* and within his capabilities." This calls into question the very premise of comparing Cardew to other interns.

regulations seem to require in the preceding section, other considerations or examples of special conditions. *See id.* §§ 404.1573(b)–(c).

Second, even assuming the ALJ *had* considered all examples of special conditions present in Cardew's case, the ALJ erroneously treated Cardew's adjusted income as "dispositive." The ALJ construed the income threshold as a "bright line test" that, in the her view, left Cardew "technically ineligible for child disability benefits."

But in this vein, the regulations repeatedly use the terms "may," "generally," and "ordinarily" where discussing earnings. *See, e.g.*, *id.* § 404.1574(a)(1) ("Your earnings *may* show you have done substantial gainful activity. *Generally*, in evaluating your work . . . our primary consideration will be the earnings you derive from the work activity . . . . *Generally*, if you worked for substantial earnings, we will find you are able to do substantial gainful activity." (emphasis added)); *id.* § 404.1574(b)(2) (delineating "earnings that will *ordinarily* show that you have engaged in substantial gainful activity" (emphasis added)). This flexible language confirms that exceptions to the general rule exist. *See Koss v. Schweiker*, 582 F. Supp. 518, 521 (S.D.N.Y. 1984) ("The word 'ordinarily' implies that there can be exceptions and therefore the income levels of § 404.1574(b)(2) are intended to create only a rebuttable presumption of ability to engage in substantial gainful activity.").

The Sixth Circuit has held as much in a similar context. In *Boyes*, the court wrote:

> We have carefully reviewed the record and find that Boyes' past relevant work did not constitute substantial gainful activity given the special conditions under which he performed his work. Any presumption that the work constituted substantial gainful activity created by the level of money Boyes earned is destroyed by the amount of work Boyes completed on a daily basis, the quality of his work and the level of supervision he required.

46 F.3d at 512. The court reasoned that income could not have demonstrated Boyes' ability to engage in "substantial work activity," particularly since his impairments "prevent[ed] him from doing 'ordinary or simple tasks satisfactorily without more supervision or assistance than is usually given other people doing similar work.'" *Id.* (quoting 20 C.F.R. § 404.1573(b)). Allowing for exceptions makes sense. In the rare case, even income adjusted in a subsidy analysis may not capture whether an individual is "able to work at the substantial . . . activity

level," 20 C.F.R. § 404.1571, or has the ability to "do[] significant physical or mental activities," *id.* § 404.1572(a).

A hypothetical proves this point. Suppose an individual with profound disabilities secured a short-term "internship" with a wealthy uncle's company. He was generously compensated $15,000 for a three-month internship—the same pay that all summer interns received. Because of his impairments, he shared all examples of special conditions listed in the regulations—that is, he required special assistance, worked irregular hours, used special equipment, relied on his parents for transportation, worked at a much lower standard of productivity, and received the internship in the first place because of his relationship with his uncle. *See id.* § 404.1573(c). As it turns out, this individual was only 20% as productive as other interns. In fact, the nephew was "unable, because of [his] impairments to do ordinary or simple tasks satisfactorily without more supervision or assistance than is usually given other people doing similar work." *Id.* § 404.1573(b). This could certainly "show that [he was] not working at the substantial gainful activity level." *Id.* But under the ALJ's "bright line" approach in this case, the claimant would still "have the ability to work at the substantial gainful activity level" because 20% of his compensation over three months, or $3,000, easily eclipses the income threshold.

This income may be generous, but it would not necessarily "show [he is] *able* to do substantial . . . activity." *Id.* § 404.1574 (emphasis added). The regulations are primarily concerned with "ability." *See id.* § 404.1571. While income is an overarching consideration and a "guide," it is still only used "to decide whether the work you have done shows that you are *able* to do substantial gainful activity." *Id.* § 404.1574(a) (emphasis added). That someone has a relative who empowers him to engage in "*gainful* work activity" for a short time does not necessarily mean that he has the *ability* to "work at the *substantial* activity level," or do "work activity that involves doing significant physical or mental activities," in the labor market. *See id.* § 404.1572 (defining "substantial gainful activity [a]s work activity that is both substantial and gainful").

*****

While the ALJ in this case used an incomplete and overly rigid legal framework, we need not decide whether Cardew can rebut the presumption that his gross earnings created under either avenue. Rather, we think a limited remand is appropriate for the ALJ to reevaluate Cardew's circumstances under the correct legal framework in the first instance. *See Reynolds*, 424 F. App'x at 414 (citing *Kalmbach*, 409 F. App'x at 859).

## C

Although we have already found that a limited remand is necessary, we briefly address Cardew's remaining arguments, each of which lacks merit.

Cardew cogently argues that all special conditions exemplified in the regulations pertained to his internship, *see* 20 C.F.R. § 404.1573, *supra* Part III.B. But he goes one step further and asserts that these conditions were "removed due to the cessation of the internship," and that the removal of these conditions therefore evidenced an unsuccessful work attempt under 20 C.F.R. § 404.1574(c). This argument misses the mark. As the ALJ found and the district court affirmed, Cardew's internship ended as all Lear internships end—at the end of their set terms. Cardew's internship did *not* end "because of [his] impairment or because of the removal of special conditions." *Id.* § 404.1574(c)(3).

Cardew also argues that Lear's summer internships *generally* do not qualify as the "kind of work activity usually done for pay or profit," *Id.* § 404.1572(b). He points to evidence in the record establishing that Lear expects less from interns than regular, full-time employees, and that internships are not "held to a competitive standard." But "the replace-some-words canon of construction has never caught on in the courts." *United States v. Perkins*, 887 F.3d 272, 276 (6th Cir. 2018). Nothing in the regulations categorically excludes paid internships from constituting substantial gainful work activity. Nor does the work that the average Lear interns were assigned come close to the classes of work generally excluded from substantial gainful activity. *See, e.g.*, 20 C.F.R. § 404.1572(c) ("Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity."). The ALJ's finding that Lear's paid internship could generally

qualify as "substantial gainful activity" is supported by substantial evidence, though we reiterate that Cardew's special conditions and circumstances warrant further examination on remand.

Finally, Cardew argues that "the ALJ failed to properly address the installation of $4,000 handicap-accessible doors installed by Lear." In his view, the doors were improperly considered an impairment-related expense, and the ALJ should have instead considered the cost of the doors in her subsidy analysis. This argument also fails. The regulations clearly provide that an impairment-related work expense is only deductible in the subsidy framework where a claimant "pay[s] the cost of the item or service." *Id.* § 404.1576(b)(3). Indeed, "[n]o deduction will be allowed to the extent that payment has been or will be made by another source." *Id.* Lear, not Cardew, paid for the doors. True, § 1573(c) explains that where an employer provides the claimant "with special equipment," that can exemplify a "special condition." But modifications to a building's structure, such as an automatic door, better fits with an "impairment-related expense" that benefits all, not "special equipment" provided only to Cardew. And since § 1576(b)(3) squarely precludes impairment-related expenses borne by the employer from being considered in the subsidy framework, we reject Cardew's interpretation here.

Therefore, we affirm the district court's judgment in these other respects.

**IV**

For the foregoing reasons, we **AFFIRM** in part and **VACATE** in part the district court's judgment and **REMAND** for further proceedings. The district court shall instruct the Commissioner to reevaluate Cardew's claim for benefits in a manner consistent with this opinion, pursuant to sentence four of 42 U.S.C. § 405(g).