NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0125n.06

Case No. 23-5718

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| DAMIAN DICKERSON on behalf of minor A.C., | ) ) | |
| Plaintiff-Appellant, | ) ) | **FILED** Mar 15, 2024 KELLY L. STEPHENS, Clerk |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) | COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| Defendant-Appellee. | ) ) | O P I N I O N |

Before: COLE, CLAY, and BLOOMEKATZ, Circuit Judges.

COLE, Circuit Judge. Damian Dickerson, on behalf of minor A.C., appeals the district court's order affirming the decision of an administrative law judge (ALJ) denying A.C. supplemental social security disability benefits. Dickerson contends that the ALJ ignored medical evidence demonstrating that A.C. met, medically equaled, and functionally equaled impairments that require a positive disability determination under the Social Security Act (the Act). Because there is substantial evidence to support the ALJ's decision, we affirm the district court.

I.

A.

A.C. was born on June 19, 2012. A.C.'s mother suffered from drug addiction, and his great uncle and great aunt, Damian and Donna Dickerson, obtained permanent custody of A.C. when he was three years old.

A.C. has the following severe impairments: attention deficit hyperactivity disorder (ADHD), incontinence, functional neurologic disorder (nervous system condition causing movement difficulties), conversion disorder (seizures, weakness, or paralysis caused by mental health issues), anxiety, and tethered cord syndrome (nervous system disorder caused by tissue attaching to the spinal cord). A.C. also has non-severe impairments: allergic rhinitis, esotropia (eyes turning inward), chin laceration, pneumonia, chromosomal abnormalities, adjustment disorder (unhealthy emotional reactions to stress), autism spectrum disorder, and multiple minor phenotypic anomalies.

These impairments manifest in different ways. For example, in January and February 2019, A.C. had several episodes where he appeared to lose consciousness but was revived by ammonia salts. Following scans of A.C.'s brain, his doctors concluded that these episodes were not seizures but instead seizure-like activity. To address his incontinence, in November 2018, A.C. had surgery to correct his tethered cord syndrome, which resulted in a short-term improvement. In early 2019, however, A.C.'s daytime bowel and bladder incontinence returned, which eventually required him to wear padded underwear. A.C.'s incontinence usually improved when he was put on a voiding, or fixed-time bathroom, schedule. A.C. also had difficulty flexing his fingers, he made "tic-like movements of his head, face, mouth, and body," and his speech was sometimes difficult to understand. (Admin R., R. 8, PageID 1074–75.) In May 2020, A.C. was temporarily hospitalized due to these abnormal movements. On July 30, 2020, he was diagnosed with autism.

Dickerson alleges that A.C. has behavioral issues at home. As of October 2019, A.C. had significant deficits in adaptive skills, was unable to dress himself properly, and lacked the fine motor skills to drink from an open cup. A.C. had bladder and bowel accidents and smeared his

feces on the wall of his room at least six different times. Between May and July of 2020, A.C.'s therapist observed impulsive behaviors and difficulty following directions, further noting that A.C. had to be supervised 24-hours a day. The Dickersons installed a security system to control A.C.'s nighttime wandering. As of September 2020, his medical records detail episodes of extreme agitation and that he tried to remove his seat belt while in the car.

A.C. had an independent educational plan (IEP) at school because he had difficulty focusing and communicating, misunderstood danger, and was below grade level in reading and writing. His behavior in school, however, varied. As of October 2018, A.C. was behaviorally "doing extremely well in the classroom." (*Id.* at PageID 1581–82.) While he struggled with impulse control, he was generally social and got along with others. In February 2019, A.C. bit another student, and his teacher reported that he "created two more [neurological] episodes as a means to get out of work." (*Id.* at PageID 351, 1634.)

A.C.'s March 2019 IEP states that while he was "argumentative with following directions and require[d] cues for appropriate behaviors," he "ask[ed] questions, participate[d] and complete[d] classwork." (*Id.* at PageID 2042–43). His behavior improved with medication but worsened in the afternoon as it wore off. His October 2019 IEP indicated he had met his adaptive behavior goals, but not his on-task goals. His self-care skills at school were good, but he had difficulty with grooming at home. In October 2019, A.C. was reported to have no significant behavioral concerns at school and to be commensurate with his peers in academic performance.

In January 2020, however, A.C. had "[i]ncreased behavior problems at school," which included running around, making unsafe choices, not completing his class work, and acting like he was fainting. (*Id.* at PageID 1869.) Several times, A.C. refused to get off the school bus in the

morning, pretending to be asleep. Over the next few weeks, however, A.C.'s teachers reported that his behavior had improved substantially and required less redirection.

A.C. had difficulty completing his schoolwork when he transitioned to online school during the COVID-19 pandemic. A July 2020 psychological report detailed A.C.'s "difficulty sustaining attention and concentration long enough to learn and store new information immediately and after a delay of time." (*Id.* at PageID 2333.) It also explained that he had difficulty coping with changes in his environment and routine, often "becom[ing] anxious and engag[ing] in emotional outbursts when frustrated." (*Id.* at PageID 2334.) In August 2020, A.C.'s therapist reported some improvement but noted that A.C. continued to work with speech and occupational therapists to address his motor skills and toilet training. Additionally, in September 2020, his neurologist noted that he was struggling to focus on schoolwork and had lost some academic skills.

B.

On October 11, 2018, Dickerson, on behalf of A.C., applied for supplemental security income (SSI), alleging an onset of disability as of June 19, 2015. A.C. was in preschool at that time. The application was denied on March 19, 2019, and denied upon reconsideration on August 20, 2019. A hearing was held before ALJ Steven Collins on August 11, 2020. During the hearing, Donna Dickerson testified that A.C. struggled to dress himself properly in the morning, required assistance with bathing and brushing his teeth, and was a messy eater. Further, despite general improvement, A.C.'s incontinence had continued; his great aunt described the three urine and two bowel movement accidents the week before the hearing as "one of the best weeks we've had." (Admin. R., R. 8, PageID 88–89.)

On December 29, 2020, the ALJ issued a written decision, finding that A.C. was not disabled within the meaning of the Act. On March 23, 2022, the Social Security Appeals Council

declined review, finalizing the decision. On May 17, 2022, Dickerson filed a civil action seeking judicial review of the ALJ's decision. The district court upheld the ALJ's decision. This appeal followed.

II.

A.

Our review of an ALJ decision is limited to "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 551 (6th Cir. 2020) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)); *see also* 42 U.S.C. § 405(g). Substantial evidence exists where "relevant evidence as a reasonable mind might accept as adequate" supports the ALJ's findings. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). It is not "[o]ur role . . . to resolve conflicting evidence in the record or to examine the credibility of the claimant's testimony." *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001). We will affirm the ALJ's findings if they are "reasonably drawn from the record or supported by substantial evidence even if that evidence could support a contrary decision." *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010).

B.

At issue is whether A.C. is disabled under the Act. A guardian may seek SSI on behalf of a child who "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The ALJ's findings

followed the governing three-step inquiry: (1) whether the minor engages in substantial gainful activity; (2) whether the minor has an impairment or combination of impairments that are severe; and (3) whether the impairment or combination of impairments "meet, medically equal, or functionally equal" impairments listed in the Code of Federal Regulations. 20 C.F.R. § 416.924. If steps one and two are met, a child is "presumed to be disabled if they suffer from an infirmity that appears on the SSA's special list of impairments" or its medical or functional equivalent. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

The parties do not dispute that A.C. meets the requirements of step one and two. On appeal, the dispute turns on step three—whether A.C.'s impairments meet, medically equal, or functionally equal a listed impairment. We will address A.C.'s claims in reverse order.

1.

Dickerson must demonstrate that A.C.'s impairments are "functionally equivalent in severity to any of the listed impairments." *Elam ex rel. Golay v. Comm'r. of Soc. Sec.*, 348 F.3d 124, 126 (6th Cir. 2003); *see also* 20 C.F.R. § 416.912(a). The ALJ must compare the "whole child['s]" functioning in all activities at home, school, and in their community to children of the same age without impairments. SSR 09-1P, 2009 WL 396031, at *2 (Feb. 17, 2009); 20 C.F.R. § 416.926a(b). A child need not "have serious or very serious limitations every day." 2009 WL 396031, at *9. The ALJ should "consider the effects of the impairment(s) longitudinally," and "[t]he fact that a child can do a particular activity or set of activities relatively well does not negate the difficulties the child has in doing other activities." *Id.* at *9–10.

The ALJ evaluated A.C.'s functioning in six domains: (1) "[a]cquiring and using information"; (2) "[a]ttending and completing tasks"; (3) "[i]nteracting and relating with others"; (4) "[m]oving about and manipulating objects"; (5) caring for oneself; and (6) "[h]ealth and

physical well-being." 20 C.F.R. § 416.926a(b)(1). To functionally equal the listed disabilities and be found disabled, A.C.'s impairments or combination of impairments must result in: (1) "marked" limitations that seriously interfere with his "ability to independently initiate, sustain, or complete activities" in at least two domains; or (2) an "extreme" limitation which "interferes very seriously" in one domain with those same abilities. 20 C.F.R. § 416.926a(a), (e)(2)–(3).

The ALJ determined that A.C.: (1) had no limitation in domain one—acquiring and using information; (2) less than marked limitations in domains two through four and domain six—attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and health and physical well-being; and (3) a marked limitation in domain five—caring for oneself. On appeal, Dickerson argues that A.C. is markedly limited in domains two and three—attending and completing tasks and interacting and relating with others—and extremely limited in domain five—caring for himself.

According to Dickerson, the ALJ failed to address the "continuous symptomology" detailed in the 2019 Bingham records and 2020 Whitten psychological report that "seriously affected" A.C.'s "attendance and completion of tasks, interaction and relating with others and ability to care for self." (Appellant Br. 25.) For example, Dickerson argues that A.C.'s ADHD medication wore off throughout the day and that his behavior worsened in the afternoons. In February 2020, A.C. began getting up at night, cutting up his socks, and attempting to leave the home, demonstrating impaired sleep hygiene and insomnia. Finally, Dickerson argues that in 2020, A.C. remained "aggressive and destructive," and kicked and bit people around him. (Appellant Br. 31.) Therefore, Dickerson maintains that the ALJ should have concluded that A.C.'s limitations remained severe, and not that A.C.'s symptoms had improved. Substantial evidence, however, supports the ALJ's findings.

Pursuant to domain two—attending and completing tasks—a school-age child is expected to focus their attention, "follow directions," complete schoolwork, organize school materials, avoid careless mistakes, and "complete family chores." 20 C.F.R. § 416.926a(h)(2)(iv). A.C.'s 2018 teacher evaluations indicate that A.C. had limited or no problems in this area when properly medicated, with the exception of completing work without mistakes, and generally functioned at grade level. While A.C. certainly had difficulty staying focused, he received extra support in school through an IEP, and in February 2020, his teachers reported A.C. could stay on task with redirection. After transitioning to online learning during the COVID-19 pandemic, A.C. continued to work with a therapist on maintaining focus, responding to redirection, and using self-soothing techniques to control his behavior. Donna Dickerson initially reported that the transition to online learning was very difficult for A.C. and that his behavioral outbursts had increased. While A.C. often required redirection, his April and September 2020 behavioral therapy notes indicate, however, that A.C. responded to that redirection and used calming techniques to complete tasks. Finally, when directed, A.C. sometimes helped his guardian with chores at home, such as taking out the trash and cleaning his bed after bladder or bowel accidents, although at times he resisted.

While A.C.'s issues with focus were not completely resolved, A.C.'s medical record indicates that A.C. can attend to and complete tasks with assistance and firm redirection. *See Barnett ex rel. D.B. v. Comm'r of Soc. Sec.*, 573 F. App'x 461, 464 (6th Cir. 2014) (finding substantial evidence supported ALJ decision that minor had less than marked limitation in attending and completing tasks because minor's medication managed his ADHD, his "behaviors stemmed from his desire for attention," and he "could 'maintain attention when motivated' and when 'working one-on-one.'"). Therefore, there was substantial evidence that A.C.'s impairments did not seriously interfere with his "ability to independently initiate, sustain," attend to, or

complete activities at school and home, warranting a less than marked limitation in this domain. *See* 20 C.F.R. § 416.926a(e)(2).

The ALJ's conclusion that A.C. has a less than marked limitation in domain three—interacting and relating with others—is also supported by substantial evidence. In this domain, a child's ability to "initiate and sustain emotional connections with others, develop and use the language of [their] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others" is evaluated. 20 C.F.R. § 416.926a(i). Donna Dickerson testified that A.C. does not play with other children, does not know when to stop talking, and screams when frustrated. An October 2019 report detailed that A.C. was argumentative when asked to follow directions. Finally, the July 2020 Whitten psychological evaluation explained that A.C. had difficulty understanding other perspectives and used anger to get what he wanted.

That same October 2019 genetic report, however, also indicated that A.C. "will interact with others" and has "no significant behavioral concerns at school." (Admin R., R. 8, PageID 1027.) Further, 2020 behavioral therapy notes demonstrate that A.C. worked with therapists to help control his mood swings and reactions to others. The purpose of these sessions was to address A.C.'s limitations in relating to others, and the July 2020 Whitten evaluation explains that A.C. would benefit from the continuation of these sessions. Finally, the ALJ acknowledged that A.C. was diagnosed with autism spectrum disorder in July 2020, but this impairment was not so severe as to interfere *seriously* with his ability to verbally communicate with others.

Dickerson counters, however, that the tics and speech difficulties A.C. developed in early 2020 impacted his communication, warranting a marked limitation. While these episodes were severe enough for A.C. to be hospitalized in May 2020, A.C.'s doctors determined that these symptoms were not caused by epileptic or movement disorders, but instead resulted from an

autoimmune response, which improved after A.C. received steroid medication. Therefore, the record supports a finding that substantial evidence exists for a less than marked limitation in this category.

The ALJ concluded that the record supported a marked limitation in domain five, or A.C.'s ability to care for himself. Under the Act, school-age children "should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although [one] may still need to be reminded sometimes to do these routinely" and "should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior." 20 C.F.R. § 416.926a(k)(2)(iv).

A.C. needs support at home and in school with exercising coping skills and remaining calm, has limited judgment regarding his personal safety, exhibits below-average adaptive skills, and needs self-care reminders. In 2020, A.C.'s unsafe behavior consisted of trying to jump from his bed, wandering into a neighbor's home without permission, and removing his seat belt and thrashing agitatedly while in a moving vehicle. In an April 2020 therapy session, however, A.C. indicated that he understood that he needed to "stop and think" before acting, such as going into his neighbor's home without permission, because it was unacceptable behavior. (Admin. R., R. 8, PageID 2214.) In September 2020, Donna Dickerson reported that the alarm system intended to keep him from wandering was still in place and she had no new safety concerns. Further, at home, A.C. could "dress, bathe, and brush teeth with reminders and assistance." (*Id.* at PageID 56.) The 2018 teacher reports and 2019 school psychoeducational evaluations indicated that at school—when properly medicated—A.C. could care for himself and complete self-feeding, toileting, and clothing management at an age-appropriate level with, at most, slight problems.

There is substantial evidence to support the ALJ's findings that A.C.'s impairments *seriously* interfered with his ability to independently initiate, sustain, or complete self-care activities. The fact that A.C. could course correct with direction and acknowledge when his actions were wrong, however, does not support a finding of an extreme limitation that *very* seriously interfered with his self-care abilities. *See* 20 C.F.R. § 416.926a(a), (e)(2)–(3).

Although not initially challenged by Dickerson, the government argues that the ALJ's findings of less than marked limitations in health and physical well-being—domain six—were reasonable. Dickerson argues in his reply brief that the ALJ should have concluded that A.C. had a marked limitation in this category as well. While appellants cannot raise new arguments for the first time in their reply briefs, they can "respond to arguments raised for the first time in appellee's brief." *United States v. Crozier*, 259 F.3d 503, 517 (6th Cir. 2001) (quoting *United States v. Jerkins*, 871 F.2d 598, 602 n. 3 (6th Cir. 1989)). This argument, however, must fail.

Domain six addresses the effects of "[a] physical or mental disorder" that can result in physical symptoms such as "bladder or bowel incontinence," somatic symptoms such as "seizure or convulsive activity, . . . [and] changes in weight or eating habits," and the impact of associated medication. 20 C.F.R. § 416.926a(*l*)(1)–(2), (4)(ii). The ALJ also evaluates whether the symptoms manifest as chronic illness or as episodic periods of worsening physical condition. 20 C.F.R. § 416.926a(*l*)(3).

Dickerson argues that the ALJ explained only how A.C.'s ongoing struggles with incontinence, insomnia, and somatic symptoms improved, but not that A.C. was cured of these impairments. The ALJ's finding of a less than marked limitation under this domain, however, is supported by: (1) improved incontinence after tethered cord surgery and a timed voiding schedule; (2) resolution of the seizure-like events; (3) behavioral therapy; and (4) steroid medication for

A.C.'s speech- and movement-related tics. The ALJ acknowledges that A.C. regressed with regard to some of these issues in mid-2019, and again in 2020 when schools closed due to the COVID-19 pandemic, but improved significantly with medication and a consistent voiding schedule. The regulation does not require a complete cure of impairments affecting physical well-being to find a less than marked limitation. Because the ALJ's findings are supported, we must defer to the ALJ's conclusion, even if there is also substantial evidence to support a marked limitation. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) (concluding that the court must defer to an ALJ decision "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.").

A.C.'s impairments should not be discounted. A.C. experiences significant health issues punctuated by periods of respite, but the improvements are often followed by new and serious concerns. We do not doubt that it is difficult for A.C. and his guardians to navigate his many health challenges, especially because the challenges keep evolving. Indeed, given the frequent and significant changes, we do not foreclose the possibility that A.C. may be able to successfully apply for disability income in the future if his condition worsens or does not respond positively to intervention such that his symptoms persist for the time period required by the regulations. But because the evidence in this record is so mixed, there is substantial evidence for the ALJ's conclusion. In the broader context of A.C.'s improvement based on use of medication, a voiding schedule, assistance in the classroom, and ability to socialize with his peers, the ALJ could find that the Bingham records and Whitten report were insufficient to establish functional equivalence to a listed impairment. *See Foltz obo R.B.K.F. v. Comm'r of Soc. Sec.*, No. 23-3362, 2023 WL 7391701, at *5 (6th Cir. Nov. 8, 2023) (finding that the ALJ correctly concluded that doctor and nurse practitioner's medical opinions were insufficient to establish medical equivalence to stem

cell transplantation, where other medical evidence demonstrated that the child's health had improved overall). Therefore, not only did the ALJ assess and reference A.C.'s medical records from 2020, but the arc of A.C.'s medical history in the record provides "more than a scintilla of evidence" that substantial evidence supported the ALJ's non-disability determination under the functional equivalence framework. *Rogers*, 486 F.3d at 241 (quoting *Cutlip*, 25 F.3d at 286).

2.

A.C. can also prove disability under the Social Security Act by demonstrating his impairments meet or medically equal a listed impairment. 20 C.F.R. §§ 416.924–416.926. To medically meet a listed impairment, a claimant "must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). An impairment is medically equivalent to a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). The ALJ should compare a claimant's impairments "with those for closely analogous listed impairments." *Id.* at (b)(2). At this step, the ALJ "must consider the combined effect of all medically determinable impairments, even those that are not severe." (Admin R., R. 8, PageID 53–54.).

Dickerson argues that the record demonstrates continuous symptoms present through June 2020 that, in combination, met or were medically equivalent to listings 111.02—epilepsy—and 112.07—somatic symptoms and related disorders (conversion disorder). Dickerson points to "over 12 months of symptomology including confusion, staring ahead or looking around and unresponsiveness" that occurred frequently and at length, requiring accommodations in school and at home. (Appellant Br. 23.) He also argues that evidence of "disruptive behavior, multiple events of smearing feces on the wall, bowel and bladder incontinence and illegible hand writing" contradict the ALJ's ruling. (*Id.* at 24.) Although A.C.'s seizure-like symptoms abated, Dickerson

maintains that the February 2019 Bingham records and July 2020 Whitten psychological report demonstrate that they "were replaced by other symptoms caused by the same [neurological] impairment, conversion reaction." (Appellant Br. 24–25.)

Substantial evidence exists to support the ALJ's conclusion that A.C.'s impairments do not meet or medically equal listing 111.02 for epilepsy. An epilepsy impairment requires:

> A. Generalized tonic-clonic seizures (see 111.00F1a) occurring at least once a month for at least 3 consecutive months (see 111.00F4) despite adherence to prescribed treatment (see 111.00C);
>
> or
>
> B. Dyscognitive seizures (see 111.00F1b) or absence seizures (see 111.00F1c), occurring at least once a week for at least 3 consecutive months (see 111.00F4) despite adherence to prescribed treatment (see 111.00C).

20 C.F.R. pt. 404, subpt. P, App. 1, Listing 111.02. A.C. was not diagnosed with tonic-clonic, dyscognitive, absence, or febrile seizures. 20 C.F.R. pt. 404, subpt. P, App. 1, Listing 111.00(F)(1). Further, "medical equivalency is not a refuge for claimants who show only intermittent signs of impairment." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 784 (6th Cir. 2017). It requires that A.C.'s impairments are "at least equal in severity and *duration* to the criteria of any listed impairment." 20 C.F.R. § 416.926(a) (emphasis added). A.C. experienced approximately seven seizure-like incidents from December 2018 to February 2019, but he does not meet the duration requirements of continued symptoms for three months after adherence to prescribed treatment. 20 C.F.R. pt. 404, subpt. P, App. 1, Listing 111.02(A)–(B). A medical evaluation from April 14, 2020 demonstrates that his last seizure-like episode occurred on February 21, 2019—shortly after he began taking seizure medication. Because A.C.'s seizure-like episodes did not continue after treatment, they are not medically equivalent in terms of severity and duration to listing 111.02 for epilepsy.

Substantial evidence also exists to support the ALJ's conclusion that A.C.'s impairments do not meet or medically equal listing 112.07 for conversion disorder. A finding of somatic symptom impairments requires:

A. Medical documentation of one or both of the following:
    1. Symptoms of altered voluntary motor or sensory function that are not better explained by another medical or mental disorder; or
    2. One or more somatic symptoms that are distressing, with excessive thoughts, feelings, or behaviors related to the symptoms.

    and

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 112.00F):
    1. Understand, remember, or apply information (see 112.00E1).
    2. Interact with others (see 112.00E2).
    3. Concentrate, persist, or maintain pace (see 112.00E3).
    4. Adapt or manage oneself (see 112.00E4).

20 C.F.R. pt. 404, subpt. P, App. 1, Listing 112.07.

The ALJ explained that A.C.'s impairments resulted in mild to moderate limitations in the first three "B criteria." In support, the ALJ cited 2018 and 2019 teacher evaluations and a 2019 psychoeducational assessment indicating that while A.C. needed classroom support, his behavior improved with medication, he responded to redirection, was on grade level at school, and generally got along with his peers. Therefore, A.C.'s impairments did not seriously interfere with his ability to understand and apply information, interact with others, or maintain concentration. *See* 20 C.F.R. pt. 404, subpt. P, App. 1, Listing 112.07(B). The ALJ acknowledged, however, that deficits in A.C.'s adaptive functioning and understanding of danger warranted a marked limitation in "B criterion" four—adapting or managing oneself.

The "B criteria" factors are similar to some of the six domains evaluated *supra* under the functional equivalence standard: specifically, domains one through three—acquiring and using information, attending and completing tasks, and interacting and relating with others—and domain

five—caring for yourself. 20 C.F.R. § 416.926a(b)(1). As stated *supra*, substantial evidence supports the ALJ's conclusion that A.C.'s: (1) abilities to attend and complete tasks and interact and relate with others warrant a less than marked limitation; and (2) abilities to care for himself warrant a marked limitation.

The remaining "B criterion" of understanding, remembering, or applying information refers to the child's "abilities to learn, recall, and use information to perform age-appropriate activities." 20 C.F.R. pt. 404, subpt. P, App. 1, Listing 112.00(E)(1). While A.C. needed help with writing, he performed in either the average or above average range for his age group in intellectual functioning, math concepts, and reading. Because this provides substantial evidence to support the ALJ's conclusion, A.C. fails to meet or medically equal the one extreme limitation or two marked limitations required for conversion disorder. 20 C.F.R. pt. 404, subpt. P, App. 1, Listing 112.07(B).

Dickerson raises two main rejoinders. First, he argues that the ALJ erred when referencing the functional equivalence portions of the opinion to justify finding A.C. had a marked limitation in 112.07's fourth "B criterion"—adapting and managing oneself—and not completing the analysis in the medical equivalence section. An ALJ, however, "can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (citation omitted). The ALJ referenced his substantial factual findings, appearing later in the opinion, to support his conclusion that A.C.'s mental impairments did not meet or medically equal a listed impairment under 112.07. An ALJ need not "spell out every fact a second time." *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

Further, Dickerson's reference to SSR 96-8p's requirement that an ALJ rationalize contradictory evidence and provide reasoning is inapplicable here, as the ruling addresses residual functional capacity, or an "individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). Because A.C. is a child, he does not operate in a work setting.

Second, a medical report from April 2020 explains that while the seizure-like episodes had ceased in February 2019, A.C.: (1) subsequently developed movement disorders, speech difficulties, and tic-like movements of the face, mouth, and body; and (2) his behavioral symptoms, incontinence, and inability to focus persisted. Dickerson argues that the ALJ failed to consider these new symptoms, which together, equal the epilepsy and conversion disorder listings.

The ALJ considered all objective medical evidence, information from teachers, family, and friends, and Donna Dickerson's hearing testimony. A review of the record demonstrates that the new symptoms to which Dickerson points did not "fit epileptic or choreiform or other patterned movement disorder[s]," but were believed to be the result of an autoimmune response, brain swelling, and an acute dystonic reaction induced by medicine. (Admin. R., R. 8, PageID 1046, 1050, 1871, 2348.) Additionally, behavioral therapy greatly improved A.C.'s ability to follow directions and process his emotions without acting out. For example, between January and February 2020, A.C. admitted to pretending to have seizure-like events, requiring him to be carried off the bus at school in the morning. This behavior was corrected when his teachers took away one-on-one time with A.C. during the school day. Between April and September 2020, A.C. worked with a therapist to implement deep breathing skills and generally responded to redirection by adults, even if he initially resisted following directions at home and at school. Finally, the July 2020 Whitten psychological report observed that while A.C. had an impaired ability to learn,

remember, pay attention, and regulate his emotions, he had no noticeable involuntary tics or tremors during the session and demonstrated adequate ability for fluid reasoning.

We are not persuaded that the ALJ's findings are legally insufficient. The ALJ analyzed the same 2020 medical records in the referenced functional equivalence analysis, acknowledging A.C.'s limitations but explaining how medical and behavioral therapies largely helped with these impairments. Further, Dickerson did not demonstrate how these symptoms are equivalent in severity and duration to tonic-clonic or dyscognitive seizures, or otherwise increase the severity of A.C.'s limitations in using information, interacting with others, and concentrating. *See* 20 C.F.R. pt. 404, subpt. P, App. 1, Listings 111.02; 112.07. Therefore, the ALJ relied on substantial evidence in concluding that A.C.'s symptoms do not meet or are not medically equivalent in severity or duration to the neurological and mental impairment listings in the Act.

## III.

For the reasons above, we affirm the district court's judgment.